**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| LAREDO NATIONAL BANCSHARES, INC., et al., | ) ) ) | CASE NO.  1:00 CV 2081 |
| Plaintiffs, | ) ) | JUDGE WELLS |
| vs. | ) ) | DEFENDANT'S MOTION FOR PAYMENT OF ATTORNEY'S FEES, |
| DONALD E. SCHULZ, | ) ) | EXPENSES AND COSTS AGAINST THE UNITED STATES OF AMERICA |
| Defendant. | ) | |

I.  INTRODUCTION

Under 28 U.S.C. §2679 (The Westfall Act), the United States of America through the Attorney General is required to defend civil actions for personal injury resulting from alleged wrongful conduct of government employees while acting within scope of employment.[1]  Since the conduct of Defendant, Donald Schulz ("Schulz"), giving rise to this personal injury action was within the scope of his employment, the Attorney General should have defended him, but did not do so based upon an incorrect refusal to certify that Schulz was acting within the scope of his employment at the time of the events giving rise to this case.  That incorrect Attorney General decision is reviewable by this court.[2]  Consequently, Schulz hereby moves the court for an order

---

[1]  28 U.S.C. §2679(b)(1) and (c).

[2]  28 U.S.C. §2679(d)(3).

finding that he was acting within the scope of his employment and is entitled to reimbursement of attorney's fees, expenses and costs incurred in defending this action and in bringing this motion.[3]

II.     STATEMENT OF FACTS

From 1991 to 1999, Schulz was employed as a research professor for national security policy by the United States Army War College ("the Army")at its Strategic Studies Institute ("SSI"), the senior research organization for Army national security policy formulation.[4]  Schulz was hired for his Latin American expertise and superb reputation in his field.[5]  He was a prolific producer.[6]  By virtue of his position, Schulz held a top-secret clearance.[7]

One of three SSI sanctioned projects assigned to Schulz in 1998 was to research and publish a manuscript on the topic of Mexican "narcopolitics."[8]  The prospective audience included the military, Congress, academia, the media and the general public.[9]  In performing his assigned tasks,

---

[3]  Indeed, under 28 U.S.C. §2679(d)(1), in addition to the Attorney General's duty to defend Schulz while acting within the scope of employment, the United States is deemed the Defendant and must substitute itself for the employee in connection with these personal injuries claims.  Accordingly, the United States has been the real party in interest throughout this case and should pay Schulz' fees, expenses and costs.

[4]  Exhibit A - Donald Schulz Deposition, pp. 57-59, 314-315.

[5]  Exhibit A, pp. 58, 122; Exhibit B - Douglas Lovelace Deposition, p. 15; Exhibit J - Schulz CV.

[6]  Exhibit B, pp. 43-46.

[7]  Exhibit A, p. 26; Exhibit B, p. 16.

[8]  Exhibit B, pp. 221-223, 263; Exhibit A, pp. 263-264, 620-621; Exhibit K - SSI 1998 Study Plan, p. 13.  (SSI had no 1999 Study Plan, and Schulz' "narcopolitics" work carried over into 1999 due to scheduling conflicts.  Exhibit B, pp. 282-283, 259-261).

[9]  Exhibit B, pp. 13-14, 24-25.

Schulz was not restricted to particular sources or source material, was permitted to contact other governmental agencies, was encouraged to contact the news media, and was required to seek comments and criticisms from others, which could include media members. [10]

Consequently, Schulz, in performing the "narcopolitics" research task, scheduled a series of interviews in July and August 1998 with government and non-government individuals. Specifically, Schulz conducted Army authorized travel from SSI's Carlisle Barricks, Carlisle, Pennsylvania to Washington, D.C., El Paso, Texas, Alexandria, Virginia, and Johnstown, Pennsylvania for interviews at or with the Office of National Drug Control Policy, Pentagon staff, Congressional drug-related committee staff, the State Department, the El Paso Intelligence Center, Joint Task Force #6, The National Drug Intelligence Center, the Defense Intelligence Agency, a retired army general, and Dolia Estevez ("Estevez"), a Washington-based reporter for *El Financiero*, a respected Mexican newspaper. [11]

Schulz' fact-finding mission took him initially to the Office of National Drug Control Policy in D.C. where he was referred to a particular research analyst at the National Drug Intelligence Center in Johnstown, Pennsylvania because that analyst was working on a particular project dealing with drug trafficking and money laundering between Mexico and the United States. [12]

---

[10] Exhibit B, pp. 71-73, 120-121, 263-265, 268, 270-272, 277-278.

[11] Exhibit A, pp. 125, 165, 178-179, 182-187, 196-200, 263-273, 284-287, 306, 624-625; Exhibit B, pp. 255-256.

[12] Exhibit A, pp. 187-190, 298-299.

Following this lead, Schulz called the National Drug Intelligence Center analyst and arranged for an authorized meeting.[13] Schulz met with two analysts and the project's supervisor and was briefed on the National Drug Intelligence Center's Operation White Tiger project.[14] The meeting dealt with unclassified information regarding a prominent Mexican family.[15] During the meeting, Schulz learned that the National Drug Intelligence Center would be publishing a document, which Schulz was told would be public information, on its Operation White Tiger work product.[16] At the meeting's conclusion, Schulz requested that a copy of the document be forwarded to him upon its completion, which it eventually was.[17]

Thereafter, Schulz interviewed Estevez to obtain her insight on Mexican "narcopolitics."[18] Schulz chose to interview Estevez because her prior writings on Mexican politics and drug cartels and their previous dealings caused Schulz to conclude that Estevez was extremely knowledgeable and a potential source of information for his research project.[19] Estevez began publishing on Mexican drug and political issues in the mid-1990's and had interviewed Schulz on a number of

---

[13] Exhibit A, pp. 303, 306-310.

[14] Exhibit C - Daniel Huffman Deposition, pp. 39, 81, 162-167, 176.

[15] Exhibit C, pp. 46-48, 98-99, 176; Exhibit A, pp. 232-233, 358, 478-480, 592-594.

[16] Exhibit A, pp. 232-233.

[17] Exhibit A, pp. 232-233, 238-239.

[18] Exhibit A, pp. 174-175.

[19] Exhibit A, pp. 167-178, 217-221, 391.

occasions concerning his Latin American expertise.[20] Estevez periodically cited Schulz as authority in her writings.[21]

During Schulz' interview of Estevez, she brought up a Mexican family's suspected drug and money laundering connections, which was the focus of the National Drug Intelligence Center's Operation White Tiger project.[22] Schulz mentioned to Estevez that the National Drug Intelligence Center was producing a report on its project and that Schulz would be receiving a copy.[23] Estevez requested that a copy be sent to her.[24] Schulz was agreeable because he wanted her expert input as to its reliability and accuracy.[25]

After concluding all interviews and other research, Schulz completed a first draft of his manuscript entitled "Narcopolitics in Mexico"[26] and sent it in November 1998 to the National Drug Intelligence Center for its critique.[27] By late March 1999, the manuscript's critique and a document entitled "Executive Summary" was sent to Schulz by the Operation White Tiger project

---

[20] Exhibit A, pp. 16, 119-134, 151-152, 167-173.

[21] Exhibit A, pp. 129, 168-169.

[22] Exhibit A, pp. 176-177, 395-397, 400-401.

[23] Exhibit A, p. 229.

[24] Exhibit A, pp. 237-240.

[25] Exhibit A, pp. 244-245, 592-594.

[26] Exhibit A, pp. 64, 461-462.

[27] Exhibit C, pp. 181-183, 203-204.

supervisor.[28] Schulz read only the first page and one-half of the Executive Summary, briefly glanced through the balance and set it aside.[29]

Four or five weeks later, Estevez called Schulz inquiring if the National Drug Intelligence Center document had been received and requested a copy of it.[30] Schulz advised Estevez that the document was sensitive and was not for publication and that Schulz wanted Estevez' input as to its reliability and accuracy.[31] Estevez acquiesced to Schulz' caveats so Schulz sent the Executive Summary to Estevez.[32]

A few weeks thereafter, Estevez got back to Schulz advising him that the document did seem reliable, but that it contained a few factual inaccuracies relating to the identities of the family's owned/controlled businesses.[33] Based in part upon Estevez' Executive Summary critique, Schulz redrafted his manuscript.[34] In the interim, Estevez, contrary to Schulz' admonitions that the document was sensitive and not for publication, published an article in *El Financiero* purporting to rely upon the National Drug Intelligence Center document.[35]

---

[28] Exhibit A, pp. 238-240.

[29] Exhibit D - Schulz' Answers to Plaintiffs' Interrogatories, #5.

[30] Exhibit A, pp. 237-240.

[31] Exhibit A, pp. 244-245, 592-596.

[32] Exhibit E - Stipulation of Facts, Schulz Affidavit, ¶¶16, 17 (Docket Document #125, Attachment A).

[33] Exhibit A, pp. 582-583.

[34] Exhibit A, pp. 490-494.

[35] See Complaint, Exhibit C.

The Executive Summary was marked "Draft" and "Law Enforcement Sensitive." [36] The Executive Summary came to Schulz from the National Drug Intelligence Center Operation White Tiger supervisor with a cover letter on plain paper, not government agency letterhead, with an admonition that the document was not to be forwarded to others. [37] The "Law Enforcement Sensitive" handling caveat was an internal National Drug Intelligence Center handling caveat with which Schulz and the Army were unfamiliar. [38] Schulz, by reason of his top-secret clearance, was familiar with classified handling caveats of "top secret," "secret," and "confidential." [39] Consequently, Schulz did not consider the document a classified document under standard government classifications, and Schulz did not consider the cover letter's prohibition against further dissemination as an official restriction since the cover letter was not on agency letterhead and appeared to a personal request. [40] Moreover, Schulz had been advised that the Executive Summary did not include any classified information and would be made public. [41]

Following Estevez' article, newspapers around the country picked up on it and published similar articles. [42] In August 2000, Plaintiffs filed suit against Schulz and a number of John Does. Various claims were alleged, all of which essentially set forth defamation and privacy invasion

---

[36] Exhibit E, ¶15.

[37] Exhibit A, pp. 527-529.

[38] Exhibit A, pp. 524-525, 634; Exhibit B, pp. 129, 265-267.

[39] Exhibit A, pp. 524-525; Exhibit B, pp. 245-247.

[40] Exhibit A, pp. 524-529; Exhibit B, pp. 279-280.

[41] See Footnotes 15, 16, *supra*.

[42] See Complaint, ¶¶10, 28 and 95.

7

claims causing personal injury to Plaintiffs in the form of reputation damage and damage to current and prospective business relationships based upon Schulz' transmission of the Executive Summary to Estevez.[43]

After being served with the Complaint, Schulz obtained a number of enlargements of time within which to answer in order to seek a defense, particularly through the Justice Department.[44] More than one year following Schulz' request for Attorney General representation, the Army advised Schulz that the Attorney General concluded that he could not certify that Schulz acted in the scope of his employment under Pennsylvania law at the time of the events giving rise to the claims. Accordingly, the Justice Department said it would not defend Schulz and the United States would not substitute itself for him as the defendant in this case.[45]

### III. LAW AND ARGUMENT

The Westfall Act, 28 U.S.C. §2679, clearly obligates the government to defend Schulz when acting within the scope of his SSI employment at the time of the events giving rise to Plaintiffs' claims.[46] The Attorney General's refusal to certify Schulz' conduct as within the scope of his SSI

---

[43] See Complaint, ¶¶8, 13.

[44] See Defendant's Second Motion for Enlargement of Time (Docket Document #13).

[45] Exhibits F, G and H - Schulz' 10/9/00 Request for Representation, Army's 11/16/01 letter to Schulz and Department of Justice's 10/26/01 letter to the Army, respectively. (The Department of Justice's refusal to defend Schulz was properly not based upon 28 U.S.C. §2679(b)(2)(B), which exempts U.S. statutory violations from the Westfall Act. Indeed, the alleged RICO violations (Count I) were based upon a conspiracy theory (see Complaint, ¶55) that was not supported by any facts, i.e. Schulz alone decided to send Estevez the Executive Summary, and no John Does were ever named as defendants. Also, the Federal Privacy Act claim (Count VII) is actionable only against an agency, not an individual. 5 U.S.C. §552a(g)(1).

[46] 28 U.S.C. §2679(c).

employment was incorrect, which caused Schulz to incur substantial attorney fees, expenses and costs.[47] The Attorney General's incorrect determination is reviewable by this court, which should find and certify that Schulz was acting within the scope of his employment at the time of the events giving rise to Plaintiffs' claims and award Schulz his attorney fees, expenses and costs. [48]

The Attorney General appropriately determined that Pennsylvania law applied to the scope of employment issue since Schulz was employed in Pennsylvania, interviewed the National Drug Intelligence Center personnel in Pennsylvania, and forwarded from his Pennsylvania office the National Drug Intelligence Center Executive Summary to Estevez. Under Pennsylvania law, conduct falls within the scope of employment if: (1) it is conduct that the employee is employed to perform; (2) the conduct occurs substantially within appropriate time and space limitations; and (3) the conduct is motivated, at least in part, by a purpose to serve the employer. [49] Schulz' conduct at issue, essentially obtaining the Executive Summary and forwarding it to Estevez, meets Pennsylvania requirements for conduct within the scope of employment, a fact the Attorney General has recently partially admitted.[50]

---

[47] As and when required by the court, Schulz will supply detailed documentation of his defense costs to the court and the Attorney General.

[48] 28 U.S.C. §2679(d)(3).

[49] *Brumfield v. Sanders*, 232 F. 3d 376, 380 (3rd Cir. 2000).

[50] Exhibit I - excerpt from Department of Justice Motion to Dismiss, Memorandum in Support, pp. 25-26, filed in *Jacobs v. National Drug Intelligence Center*, U.S.D.C., S.D. Texas, Case No. L-01-072.

As a research professor on national security policy issues, Schulz was expected to conduct research.[51] SSI specifically assigned Schulz to research and publish a manuscript entitled Narcopolitics in Mexico. Not being restricted to particular sources, Schulz began his interview process with the Office of National Drug Control Policy (having been referred there by one of his colleagues[52]) where he was further referred to the National Drug Intelligence Center who happened to be in the midst of a study on Mexican drug trafficking and money laundering. Schulz followed up and arranged a meeting with the National Drug Intelligence Center analysts and supervisor working on the project and requested and received its work product. Contact with other governmental agencies for research purposes was condoned by SSI. Schulz' fact-finding mission included other governmental bodies such as Congress, the Pentagon, the State Department, the Defense Intelligence Agency, the El Paso Intelligence Center and Joint Task Force #6. Schulz' interview with Estevez and subsequent request for feedback on the Executive Summary's reliability was similarly permitted by SSI who encouraged and condoned news media contact, comment and critique to further research projects.

Under these facts, Schulz' conduct satisfies Pennsylvania scope of employment criteria. First, obtaining oral and written information from the National Drug Intelligence Center and forwarding the written information to a knowledgeable reporter for comment and feedback were acts the Army expected, permitted and encouraged for the purpose of researching and developing national security policy, part of the Army's objective. Second, Schulz' conduct was performed from the Summer of 1998 through and beyond the Spring of 1999 and involved authorized travel to

---

[51] Exhibit B, pp. 12-13.

[52] Exhibit A, p. 306.

Pennsylvania, Washington, D.C., Virginia and Texas well within time and space limitations acceptable to SSI.[53]  Third, Schulz was motivated, in securing Estevez' input, to produce a better research project for SSI, not for any personal purpose.  Under the facts and Pennsylvania law, Schulz' conduct was clearly the type performed by SSI research professors, was within appropriate time and space limitations and was for the purpose of serving the Army.  Accordingly, the Attorney General's failure to certify Schulz' conduct as within the scope of employment was incorrect.

Furthermore, even when employees exceed their power, perform unauthorized acts, or commit torts or criminal acts, the conduct still falls within the scope of employment if the activity in some way furthers the employer's business.[54]  Thus, the government cannot remove Schulz from his employment scope by attempting to categorize his conduct as either unauthorized, forbidden, tortious or even criminal, none of which it was, since Schulz was attempting to further his research project in obtaining the Executive Summary and forwarding it to Estevez for her assessment of its reliability and accuracy.  Estevez was known to Schulz to be very knowledgeable about Mexican politics and drug cartels.  Thus, he turned to someone with whom he had a long-standing, trusting relationship for professional input.  Perhaps Schulz' trust was, in hindsight, misplaced, but that does not detract from the fact that Schulz was attempting to further his SSI sanctioned research project.  Clearly, Estevez ignored Schulz' admonitions and breached his trust in her when she published her news article.  Estevez' conduct, however, is not at issue.

---

[53]  Exhibit B, pp. 201-206, 260-261, 282-283.

[54]  *Brumfield*, 232 F. 3d, *supra* @ 381; *Mauk v. Wright*, 367 F. Supp. 961, 968 (E.D. Pa. 1973); *Coles v. Sutphen*, 167 Pa. Super. 457, 461 (1950).

The government may also argue that Schulz made a mistake in trusting a reporter. Nonetheless, the Army encouraged news media relationships and information exchange. The Army gave its research professors discretion in making decisions affecting their research.[55] If Schulz made a mistake, it still fell within his job description and discretionary duties.

Similarly, the government may argue that Schulz made a mistake because the Executive Summary was forwarded to Schulz with instructions not to disclose it to others. Nonetheless, SSI's Director has testified that the decision to forward the Executive Summary to Estevez was ultimately Schulz' judgment call.[56] When an employer places trust or responsibility in the employee's hands, the employer remains responsible for the employee's lack of judgment or discretion when the conduct is fairly adapted to accomplish the employer's purpose.[57] SSI's Director indicated that Schulz probably should have checked with his supervisor or the National Drug Intelligence Center supervisor before forwarding the Executive Summary to Estevez, but that was Schulz' judgment call to make. If Schulz made an unwise decision, it does not remove his conduct from the scope of his employment because he was attempting to further his sanctioned research project.

The fact that the Executive Summary was a draft and carried a handling caveat of "Law Enforcement Sensitive" also does not remove Schulz' conduct from the scope of employment. Schulz' meeting with the National Drug Intelligence Center was for the purpose of discussing unclassified information. Schulz was told that the Executive Summary would become public. More

---

[55] Exhibit B, pp. 123-127.

[56] *Id.*

[57] *Guille v. Campbell*, 200 Pa. 119, 120 (1901); *Coles*, 167 Pa. Super., *supra* @ 462 (1950).

importantly, the "Law Enforcement Sensitive" handling caveat was meaningless to Army employees, including its SSI Director. Army regulations deal with classified information that is top secret, secret or confidential. Even if the National Drug Intelligence Center considered "Law Enforcement Sensitive" as to be the equivalent of "for official use only," that was not an order or directive known to or binding upon the Army.[58] Furthermore, "for official use only" is not a classified document.[59] Moreover, Schulz advised Estevez that the Executive Summary was sensitive and was not for publication. Estevez acquiesced in Schulz' admonitions. The fact that Estevez may have considered, after reading the document, that it required, in her mind, publication is conduct over which Schulz had no control and is irrelevant to whether Schulz was acting in furtherance of producing his sanctioned research project. A government employee's decision to provide information to the media falls within the scope of employment.[60]

---

[58] Exhibit B, pp. 123-125, 250-251.

[59] Exhibit B, pp. 250-251.

[60] See *Rodriguez v. Sarabyn*, 129 F. 3d 760 (5th Cir. 1997) (ATF employees authorized to speak to media acted within employment scope even when making misguided defamatory remarks since they were given discretion in dealing with media.); *Williams v. United States*, 71 F. 3d 302 (5th Cir. 1995) (U.S. Congressman within scope of employment when defaming lobbyist to media regarding pending legislation since legislator has discretion to inform constituents.); *Barry v. Whalen*, 796 F. Supp. 885 (E.D. Virginia 1992) (Federal prison employees divulging confidential inmate information to media in violation of federal regulations and inmate's privacy rights within scope of employment because conduct, no matter how ill-advised, mistaken, rash, impulsive or tortious, was an attempt to perform prison business.) Compare *Nadler v. Mann*, 951 F. 3d 301 (11th Cir. 1992) (Assistant U.S. Attorney's defamatory communication to media of ongoing FBI bribery investigation of incumbent judge against whom AUSA was running was not within employment scope since AUSA admitted his conduct, done while on annual leave, was purely personal, not part of his job.)

IV.	CONCLUSION

Under Pennsylvania law, Schulz' research efforts pertaining to "Narcopolitics in Mexico" fall squarely within his employment's scope. The project was authorized. SSI expected Schulz to perform research. Schulz was directed to government agencies. Schulz was voluntarily provided the Executive Summary. Among the many people Schulz interviewed was Estevez, a reporter extremely knowledgeable about the Mexican "narcopolitics" with whom Schulz had a long-standing, ongoing relationship. It was natural and workmanlike for Schulz to seek Estevez' input into a document about which Schulz knew little or nothing, and Estevez knew much more. If Schulz made a mistake, it was his judgment call to make. SSI's Director, while questioning Schulz' judgment call, does not substitute his own judgment for that of Schulz. [61] Within the Army, Schulz has never been warned, reprimanded or disciplined in any fashion for the events that led to this lawsuit. [62]

Under the Westfall Act, the Attorney General is required to defend government employees sued for conduct within the scope of their employment. The Attorney General's incorrect certification that Schulz was not with the scope of his employment must be rectified by this court with a order that Schulz was acting within the scope of his employment and should have been entitled to a defense by the Attorney General and is entitled to reimbursement of his attorney fees, expenses and costs that the Attorney General's incorrect decision has caused Schulz to incur.

---

[61]   Exhibit B, pp. 72, 124-125.

[62]   Exhibit B, pp. 257, 280-281.

Respectfully submitted,

s/ Philip J. Weaver, Jr.
Philip J. Weaver, Jr. (0025491)
**Smith Marshall, LLP**
1965 East Sixth Street, Suite 500
Cleveland, Ohio 44114-2298
(216) 781-4994    Fax: (216) 781-4994
E-mail: pjw@smithmarshall.com

Attorney for Defendant, Donald Schulz

## CERTIFICATE OF SERVICE

I hereby certify that on this  29th  day of August, 2003 a copy of the foregoing was filed electronically with the extensive exhibits being manually filed.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.   In addition, a copy of the foregoing document was served by facsimile and first class U.S. mail, postage prepaid, this  29th  day of August, 2003, to Sara W. Clash-Drexler, U.S. Department of Justice, Civil Division, Federal Programs Branch, P.O. Box 883, Room 939, Washington, D.C.  20044.

/s/ Philip J. Weaver, Jr.
Philip J. Weaver, Jr.